01
02
03
04
05                 UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF CALIFORNIA
06
07 CLIFTON FREEMAN,                    )
                                       )
08        Petitioner,                  )   CASE NO. 2:07-cv-01310-RSL-JLW
                                       )
09        v.                           )
                                       )
10 D.K. SISTO, Warden,                 )   REPORT AND RECOMMENDATION
                                       )
11        Respondent.                  )
   _____)
12

13        I.      SUMMARY

14        Petitioner Clifton Freeman is currently incarcerated at the California Training Facility

15 in Soledad, California ("CTF Soledad").  He was convicted of second degree murder in Santa

16 Clara County Superior Court on April 9, 1986, and was sentenced to fifteen-years-to-life with

17 the possibility of parole.  (*See* Docket 8, Exhibit 1.)  He has filed a petition for writ of habeas

18 corpus under 28 U.S.C. § 2254 challenging the 2005 denial of parole by the Board of Parole

19 Hearings of the State of California (the "Board").[1]  (*See* Dkt. 1.)  Respondent has filed an

20 answer to the petition together with relevant portions of the state court record, and petitioner

21 has filed a traverse in reply to the answer.  (*See* Dkts. 8 and 12.)  The briefing is now

22
          _____

               [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
          2005.  *See* California Penal Code § 5075(a).

          REPORT AND RECOMMENDATION -1

01 complete and this matter is ripe for review.  The Court, having thoroughly reviewed the

02 record and briefing of the parties, recommends the petition be denied and this action be

03 dismissed with prejudice.

04     II.   BACKGROUND

05       On June 22, 1985, Mark Heyberz was awakened at 11:30 p.m. when his next door

06 neighbor, petitioner, knocked on his door.  (*See* Dkt. 8, Ex. 2 at 17.)  Petitioner asked to

07 borrow an air pump, and Mr. Heyberz advised petitioner that he did not own one.  (*See id*.)

08 After petitioner's discussion with Mr. Heyberz concluded, petitioner saw another neighbor,

09 Toshiko Tojima, doing yard work in front of her residence.  (*See id*. at 18.)  Petitioner then

10 "decided he was going to hurt her as she had angered him on previous occasions during the

11 past six to seven years, calling him Frank instead of Clifton.  He made the decision to use [a]

12 rock against her as he was crossing the street to her residence."  (*Id*.)

13       While the victim was busy gardening, petitioner sneaked up behind her and

14 momentarily hid behind a tree to avoid being seen.  (*See id*. at 19.)  He picked up a large sharp

15 rock and threw it at her, but the rock missed her.  (*See id*.)  He then immediately grabbed

16 another rock and moved within five feet of the victim.  (*See id*.)  When he threw the second

17 rock, it hit the victim in the back of the head and knocked her unconscious.  (*See id*.)  He

18 started to move the victim, but when she began to move her body and moan petitioner

19 "became scared" and decided to move her back to where she had originally fallen.  (*See id*.)

20 Before returning to his residence, petitioner discarded the two rocks.  (*See id*.)  When he got

21 home, he admitted to his brother that he had "hit" the victim.  (*See id*.)

22       The victim, who was fifty-years-old, was discovered by her nine-year-old son.  (*See
id*. at 16.)  He summoned the police.  (*See id*.)  When officers arrived at the scene, they

REPORT AND RECOMMENDATION -2

01   "observed a woman lying in a pool of blood in a walkway…." (*Id*.)  Although the officers

02   initially believed the victim had received a gunshot wound to the back of her head, x-rays at

03   the hospital revealed that the wound, which measured three-inches around and one-and-a-half

04   to three-quarters of an inch deep and exposed the victim's skull, actually resulted from her

05   being struck by a large blunt object.  (*See id*. at 16-17.)  The victim never regained

06   consciousness before she died on June 26, 1985.  (*See id*. at 16.)  When questioned by the

07   police, petitioner initially denied having any knowledge regarding the offense.  (*See id*. at 18.)

08   As the interrogation continued, however, petitioner admitted striking her in the head with a

09   rock.  (*See id*.)

10       During the 2005 parole hearing, petitioner "accept[ed] the [above statement of] facts"

11   regarding the commitment offense.  (*See id*. at 20.)  He also explained that he "became very

12   angry at another neighbor, [Mr. Heyberz,] and then [he] took all [his] anger out on Mrs.

13   Tojima."  (*See id*. at 20.)  Although petitioner claims he "never intended to kill Mrs. Tojima

14   … [he admits that he] did intend to throw a rock at her, which [he] did stupidly out of anger."

15   (*Id*. at 21.)

16       Petitioner was convicted of one count of second degree murder in Santa Clara County

17   Superior Court on April 9, 1986, and sentenced to fifteen-years-to-life with the possibility of

18   parole.  (*See* Dkt. 8, Ex. 2 at 1.)  His minimum eligible parole date was set for September 14,

19   1994.  (*See id*.)  The parole denial which is the subject of this petition took place after a parole

20   hearing held on November 2, 2005.  (*See id*. at 105-06.)  This was petitioner's third overall

21   parole consideration hearing.  (*See* Dkt. 1 at 4.)  As of the date of the 2005 parole hearing,

22   petitioner was thirty-eight-years-old, and had been in custody for approximately twenty years.

(*See* Dkt. 8, Ex. 2 at 32.)

REPORT AND RECOMMENDATION -3

01        After denial of his 2005 application, petitioner filed habeas corpus petitions in the

02  Santa Clara County Superior Court, California Court of Appeal, and California Supreme

03  Court.  (*See* Dkt. 8, Exs. 3-5.)  Those petitions were unsuccessful.  (*See id*.)  This federal

04  habeas petition followed.  Petitioner contends the 2005 denial by the Board violated his Fifth

05  and Fourteenth Amendment Due Process rights.  Thus, petitioner does not challenge the

06  validity of his conviction, but instead challenges the Board's 2005 decision finding him

07  unsuitable for parole.

08        III.     STANDARD OF REVIEW

09        The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

10  petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

11  320, 326-27 (1997).  Because petitioner is in custody of the California Department of

12  Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

13  vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

14  *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

15  petition by a state prisoner in custody pursuant to a state court judgment, even when the

16  petitioner is not challenging his underlying state court conviction."). Under AEDPA, a habeas

17  petition may not be granted with respect to any claim adjudicated on the merits in state court

18  unless petitioner demonstrates that the highest state court decision rejecting his petition was

19  either "contrary to, or involved an unreasonable application of, clearly established Federal

20  law, as determined by the Supreme Court of the United States," or "was based on an

21  unreasonable determination of the facts in light of the evidence presented in the State court

22  proceeding."  28 U.S.C. § 2254(d)(1) and (2).

REPORT AND RECOMMENDATION -4

01          As a threshold matter, this Court must ascertain whether relevant federal law was

02   "clearly established" at the time of the state court's decision.  To make this determination, the

03   Court may only consider the holdings, as opposed to dicta, of the United States Supreme

04   Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

05   precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

06    331 F.3d 1062, 1069 (9th Cir. 2003).

07          The Court must then determine whether the state court's decision was "contrary to, or

08   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

09   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

10   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

11   Supreme] Court on a question of law or if the state court decides a case differently than [the]

12   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

13   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

14   state court identifies the correct governing legal principle from [the] Court's decisions but

15   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

16   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

17   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

18   established federal law erroneously or incorrectly.  Rather that application must also be

19   [objectively] unreasonable."  *Id.* at 411.

20          In each case, the petitioner has the burden of establishing that the state court decision

21   was contrary to, or involved an unreasonable application of, clearly established federal law.

22   *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

     whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

REPORT AND RECOMMENDATION -5

01 state court decision because subsequent unexplained orders upholding that judgment are

02 presumed to rest upon the same ground. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

03 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

04       Finally, AEDPA requires federal courts to give considerable deference to state court

05 decisions, and state courts' factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1).

06 Federal courts are also bound by a state's interpretation of its own laws. *See Murtishaw v.

07 Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

08 (9th Cir. 1993)).

09       IV.      FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

10       A.      *Due Process Right to be Released on Parole*

11       Under the Fifth and Fourteenth Amendments to the United States Constitution, the

12 government is prohibited from depriving an inmate of life, liberty or property without the due

13 process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

14 analyzed in two steps: the first asks whether the state has interfered with a constitutionally

15 protected liberty or property interest of the prisoner, and the second asks whether the

16 procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of

17 Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

18 1123, 1127 (9th Cir. 2006).

19       Accordingly, our first inquiry is whether petitioner has a constitutionally protected

20 liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

21 *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

22 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

"the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

REPORT AND RECOMMENDATION -6

01  The Court in *Greenholtz* determined that although there is no constitutional right to be

02  conditionally released on parole, if a state's statutory scheme employs mandatory language

03  that creates a presumption that parole release will be granted if certain designated findings are

04  made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7,

05  12; *Allen*, 482 U.S. at 377-78.

06          As discussed *infra*, California statutes and regulations afford a prisoner serving an

07  indeterminate life sentence an expectation of parole unless, in the judgment of the parole

08  authority, he "will pose an unreasonable risk of danger to society if released from prison."

09  Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

10  parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*,

11  306 F.3d at 902.  To similar effect, *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

12  that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

13  possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

14  release date, a liberty interest that is protected by the procedural safeguards of the Due

15  Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

16  upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

17  *Sass*, 461 F.3d at 1127.

18          Because the Board's denial of parole interfered with petitioner's constitutionally-

19  protected liberty interest, this Court must proceed to the second step in the procedural due

20  process analysis and determine whether the procedures accompanying that interference were

21  constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

22  board's decision deprives a prisoner of due process with respect to this interest if the board's

    decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing

REPORT AND RECOMMENDATION -7

01 *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

02 applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

03 Court to determine "whether there is any evidence in the record that could support the

04 conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

05 involved the accumulation of good time credits rather than release on parole, later cases have

06 held that the same constitutional principles apply in the parole context because both situations

07 directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

08 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

09 Court in *Hill* in the parole context); *Sass*, 461 F.3d at 1128-29 (holding the same); *Biggs*, 334

10 F.3d at 915 (holding the same); *McQuillion*, 306 F.3d at 904 (holding the same).

11       "The fundamental fairness guaranteed by the Due Process Clause does not require

12 courts to set aside decisions of prison administrators that have some basis in fact," however.

13 *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

14 the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

15 455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

16 *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

17 habeas review when it upheld the finding of the prison administrators despite the Court's

18 characterization of the supporting evidence as "meager."  *See id.* at 457.

19       B.    *California's Statutory and Regulatory Scheme*

20       In order to determine whether "some evidence" supported the Board's decision with

21 respect to petitioner, this Court must consider the California statutes and regulations that

22 govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

Board is authorized to set release dates and grant parole for inmates with indeterminate

REPORT AND RECOMMENDATION -8

01   sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq*.  Section 3041(a) requires the Board

02   to meet with each inmate one year before the expiration of his minimum sentence and

03   normally set a release date in a manner that will provide uniform terms for offenses of similar

04   gravity and magnitude with respect to their threat to the public, as well as comply with

05   applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

06   date "unless it determines that the gravity of current convicted offense or offenses, or the

07   timing and gravity of current or past convicted offense or offenses, is such that consideration

08   of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

09   to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

10   dates" which take into account the number of victims of the offense as well as other factors in

11   mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

12   setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

13   § 2402, *et seq*.

14        Accordingly, the Board is guided by the following regulations in making a

15   determination whether a prisoner is suitable for parole:

16        (a) General. The panel shall first determine whether the life
17        prisoner is suitable for release on parole. Regardless of the
            length of time served, a life prisoner shall be found unsuitable
18        for and denied parole if in the judgment of the panel the
            prisoner will pose an unreasonable risk of danger to society if
19        released from prison.

20        (b) Information Considered. All relevant, reliable information
            available to the panel shall be considered in determining
21        suitability for parole. Such information shall include the
            circumstances of the prisoner's social history; past and present
            mental state; past criminal history, including involvement in
22        other criminal misconduct which is reliably documented; the
            base and other commitment offenses, including behavior before,
            during and after the crime; past and present attitude toward the

REPORT AND RECOMMENDATION -9

01        crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

05  15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

06  factors to further assist the Board in analyzing whether an inmate should be granted parole,

07  although "the importance attached to any circumstance or combination of circumstances in a

08  particular case is left to the judgment of the panel." 15 CCR § 2402(c).

09        In examining its own statutory and regulatory framework, the California Supreme

10  Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

11  "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

12  current threat to public safety, and not merely whether some evidence confirms the existence

13  of certain factual findings." *Id.*, 44 Cal.4th 1181, 1212 (2008).  The court also asserted that

14  the Board's decision must demonstrate "an individualized consideration of the specified

15  criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability factors that

16  forms the crux of the parole decision; the significant circumstance is how those factors

17  interrelate to support a conclusion of current dangerousness to the public." *Id*. at 1204-05,

18  1212.  As long as the evidence underlying the Board's decision has "some indicia of

19  reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

20  California courts have continually noted, the Board's discretion in parole release matters is

21  very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

22  regulations, and California law clearly establish that the fundamental consideration in parole

decisions is public safety and an assessment of a prisoner's current dangerousness. *See id.*, at

REPORT AND RECOMMENDATION -10

01  1205-06.

02        C.        *Summary of Governing Principles*

03        By virtue of California law, petitioner has a constitutional liberty interest in release on

04  parole.  The parole authorities may decline to set a parole date only upon a finding that

05  petitioner's release would present an unreasonable present risk of danger to society if he is

06  released from prison.  Where the parole authorities deny release, based upon an adverse

07  finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

08  if there is "some evidence" in the record to support the parole authority's finding of present

09  dangerousness.  The penal code, corresponding regulations, and California law clearly support

10  this definition of the issues.

11        V.        PARTIES' CONTENTIONS

12        Petitioner contends that the Board violated his federal due process rights by finding

13  him unsuitable for parole without "some evidence" that he posed an unreasonable risk of

14  danger to society if released from prison as of November 2, 2005, the date of the hearing.

15  (*See* Dkt. 1 at 6.)  Specifically, petitioner claims the Board improperly relied upon immutable

16  facts, such as the nature of the commitment offense, to deny him parole.  (*See id.* at 4-6.)  He

17  also argues that the Board's parole denial "offends due process and deprives Petitioner and

18  those similarly situated of equal protection under the law," because the Board should have

19  conducted a "proportionality analysis" before finding him unsuitable for parole.  (*Id.* at 7-9.)

20  Finally, petitioner asserts that the Board and Governor of California have implemented a "no-

21  parole policy" for life prisoners, in violation of his constitutional rights.  (*See id.* at 6-7.)

22        Respondent claims that petitioner does not have a constitutionally protected liberty

    interest in being released on parole, that the "some evidence" standard is inapplicable in this

REPORT AND RECOMMENDATION -11

01  context, and that even if he does have a protected liberty interest, the Board adequately

02  predicated its denial of parole on "some evidence."  (*See* Dkt. 8 at 3-12.)  Accordingly,

03  respondent argues that petitioner's constitutional rights were not violated by the Board's 2005

04  decision, and the Santa Clara County Superior Court's Order upholding the Board's 2005

05  parole denial was not an unreasonable application of clearly established federal law.  (*See id.*

06  at 11-12.)

07      VI.     ANALYSIS OF RECORD IN THIS CASE

08          A.     *State Court Proceedings*

09          After the Santa Clara County Superior Court denied his habeas petition, petitioner

10  filed habeas petitions in the California Court of Appeal and California Supreme Court.  (*See*

11  *id.*, Exs. 3-5.) Both petitions were summarily denied.  (*See id.*)  Respondent admits that

12  petitioner's habeas petition was timely, and petitioner properly exhausted each of his claims

13  before the California Supreme Court.  (*See id.* at 3.)  This Court reviews the Santa Clara

14  County Superior Court's Order upholding the Board's decision to determine whether it meets

15  the deferential AEDPA standards, as it is the last reasoned state court decision.  *See Ylst*, 501

16  U.S. at 803-04.

17          B.     *Petitioner's Due Process Claim*

18          The Board based its decision that petitioner was unsuitable for parole primarily upon

19  his commitment offense and history of severe mental problems related to the offense, but also

20  cited petitioner's prior criminal record and opposition by law enforcement and the victim's

21  surviving spouse.  (*See* Dkt. 8, Ex. 2 at 98-105.)  The Board's findings tracked the applicable

22  unsuitability and suitability factors listed in § 2402(b), (c) and (d) of title 15 of the California

Code of Regulations.  After considering all reliable evidence in the record, the Board

01    concluded that evidence of petitioner's positive behavior in prison did not outweigh evidence

02    of his unsuitability for parole.  (*See id*. at 104.)

03         1.    *Petitioner's Commitment Offense and Psychological Problems*

04         The Board primarily relied upon the circumstances of petitioner's commitment

05    offense, as well as petitioner's history of severe mental problems related to the offense, to find

06    him unsuitable for parole.  (*See id*. at 98-102.)  Specifically, the panel found that the offense

07    "was carried out in a manner that demonstrates an exceptionally callous disregard for human

08    suffering, in that the victim's nine-year-old son discovered her bloodied and unconscious

09    body and had to call for help, and indeed, this must [have] caused him significant emotional

10    problems and trauma … most likely throughout his life."  (*Id*. at 99.)  *See also* 15 CCR §

11    2402(c)(1)(D).  In addition, the Board found that "the motive for the crime was inexplicable

12    or very trivial in relation to the offense … as, according to the record, it was because the

13    victim had repeatedly called [petitioner] by the wrong name."  (Dkt. 8, Ex. 2 at 98-99.)  *See*

14    *also* 15 CCR § 2402(c)(1)(E).  The Board therefore concluded that "the offense was carried

15    out in an especially cruel and callous manner." (Dkt. 8, Ex. 2 at 98.)

16         The Board also "not[ed] that [petitioner was] subsequently found to have significant

17    mental health issues and that might [have] played a part in this crime." (*Id*. at 99.)  California

18    law provides that "psychological factors," including a prisoner's "lengthy history of severe

19    mental problems related to the offense," must be considered by the Board as a factor tending

20    to indicate unsuitability for parole.  *See* 15 CCR § 2402(c)(5).  Petitioner was diagnosed in the

21    mid-1980s as a paranoid schizophrenic with auditory and visual hallucinations, as well as

22

01 antisocial personality disorder.  (Dkt. 1, Ex. C at 2.)[2]  His most recent psychological

02 evaluation, dated October 21, 2005, described petitioner as a "solitary child who heard and

03 saw 'demons,'" and who attempted to commit suicide at least three times by driving a

04 motorcycle off a mountain, swallowing a fork, and hanging himself.  (*Id.*)  The psychologist

05 observed that petitioner "currently takes Celexa and Vistaril," medications which "[have]

06 assisted him greatly," and noted that "[c]ontinuing with this program is indicated, if parole is

07 granted."  (*Id.* at 2-3.)  Despite petitioner's history of mental illness, the psychologist asserted

08 that petitioner would pose "less risk of violence than the average citizen in the community.

09 The substantial number of years he has served, along with his work and living plans, should

10 hold him in good stead."  (*Id.* at 4.)  Thus, the psychologist's assessment that petitioner has

11 an "[above-average] likelihood of … remaining violence and crime-free" appears largely

12 dependent upon petitioner's ability to continue his current regime of psychiatric medication

13 once released into the community.  (*See id.* at 2-4.)

14       During the hearing, the Board questioned petitioner about the drug administration

15 process at CTF Soledad, and asked whether he would ever consider "going off the meds."

16 (*See* Dkt. 8, Ex. 2 at 59 and 63.)  Petitioner responded, "I know that I need my medicine.  And

17 [there have been] a lot of incidents … since I've been incarcerated … [such as] the medicine

18 being tampered with or me not having it."  (*Id.* at 59.)  After a certain period of time without

19 proper medication, "I start to feel something and so I immediately go in and talk to them [to

20 obtain the proper dosage of medicine]." (*Id.*)  Petitioner also explained that although the

21 medical personnel at the prison have expressed a desire to reduce petitioner's dosage, or even

22  

---

[2] Petitioner failed to label the exhibits to his petition.  The Court will therefore refer to the Santa Clara Superior Court Order as "Exhibit A," the 2005 parole hearing transcript as "Exhibit B," and the October 21, 2005 Psychological Evaluation as "Exhibit C."

REPORT AND RECOMMENDATION -14

01   wean him off the medication altogether, petitioner does not think it is a good idea.  (*See id*. at

02   63.)  When challenged on this point by the Santa Clara County District Attorney, petitioner

03   insisted, "I'm not going to stop taking my meds."  (*Id*. at 69.)

04         The record contains ample evidence that petitioner's paranoid schizophrenia was a

05   leading cause of his commitment offense.  Because the psychologist's favorable risk

06   assessment was apparently based upon the assumption that petitioner would continue to take

07   the proper dosage of his psychiatric medications if released on parole, the Board's one-year

08   parole denial to give petitioner additional time to "demonstrate an ability to maintain [his]

09   gains over an extended period of time" was reasonable.  (*Id.*)  The Board could reasonably

10   conclude that it was uncertain whether petitioner could maintain his recent gains outside the

11   structured environment of CTF Soledad, especially because there was apparent disagreement

12   between petitioner and the medical personnel at CTF Soledad regarding the "correct" dosage

13   of petitioner's medications.  In its decision, the Board noted that petitioner had been

14   incarcerated for approximately twenty years, but had only remained discipline-free since

15   1999.  Although 1999 marked petitioner's start "on this path of progress … approximately six

16   years [of discipline-free behavior] out of 20 is fairly recent [improvement]."  (*Id*. at 103.)  As

17   a result, the Board found that "we definitely need to make sure that you keep on the good

18   track that you are currently on."  (*Id*.)  Accordingly, the Board's conclusion that petitioner's

19   behavior if released would be "unpredictable," and therefore present an unreasonable risk of

20   danger to society, was supported by "some evidence" in the record.

21         Although the Santa Clara County Superior Court disagreed with the Board's

22   discussion of petitioner's commitment offense, it agreed that petitioner's history of severe

      mental illness necessitated additional observation before he should be released on parole.

REPORT AND RECOMMENDATION -15

01 Specifically, the superior court asserted that "the Board erred in calling the crime

02 'exceptional' and finding a 'disregard for human suffering'" because "the only evidence was

03 that the victim was rendered unconscious almost immediately…." (Dkt. 8, Ex. 3 at 1.)  In

04 addition, the superior court stated that the Board was precluded from "finding that Petitioner's

05 motive was inexplicable or trivial (because the motive was rooted in Petitioner's mental

06 illness)…." (*Id*.)  Because petitioner does have a "lengthy history of severe mental problems

07 related to the offense," however, the superior court also concluded that the Board's "parole

08 denial, for one year, can withstand constitutional scrutiny" on that basis.  (*Id*.)

09         2.      *Petitioner's Criminal Record*

10         The Board also relied upon petitioner's previous criminal record to find him

11 unsuitable for parole.  The Board is required to consider a prisoner's "past criminal history,

12 including involvement in other criminal misconduct which is reliably documented" when

13 making a determination regarding a prisoner's suitability for parole.  *See* 15 CCR § 2402(b).

14 Furthermore, the California Court of Appeal has approved the consideration of arrests,

15 without convictions, in determining suitability for parole.  *See In re Gilbert Fuentes*, 135

16 Cal.App.4th 152, 163 (2005) (finding "some evidence, based on the nature of the commitment

17 offense and [the prisoner's] prior criminality, to support the Board's denial of parole.").

18         The Board noted that although petitioner was only seventeen-years-old at the time of

19 the commitment offense, he already "had six juvenile arrests for burglary, grand theft, and

20 malicious mischief, [he] had a stay at the juvenile ranch [prior to the commitment offense],

21 and [was] actually on a ranch for a while at the time of this offense."  (Dkt. 8, Ex. 2 at 102.)

22 Petitioner admitted to the panel that he was staying at the California Youth Authority, which

he calls the "boy's ranch," during the week of the commitment offense, and claimed he "kept

01 having visions and stuff coming in [his] mind…." (*See id*. at 24-25.)  Thus, there was "some

02 evidence" in the record to support the Board's finding that petitioner's criminal history tends

03 to indicate unsuitability for release on parole.

04        3.    *Opposition by Law Enforcement and the Victim's Surviving Spouse*

05       During the hearing, the Board also considered opposition to petitioner's release on

06 parole by the Santa Clara County District Attorney, San Jose City Police Department, and the

07 victim's surviving spouse.  (*See id*. at 47-49 and 102-03.)  Specifically, the district attorney

08 attended the hearing, and described petitioner's "documented history of some difficulty

09 controlling impulses…." (*Id*. at 80.)  The victim's husband did not attend the hearing, but

10 wrote a letter to the Board describing the pain he and his son suffered as a result of the

11 victim's sudden death and absence from their lives.  (*See id*. at 48-49.)  He also asked the

12 Board to keep petitioner in prison for the duration of his life sentence.  (*See id*. at 49.)

13       In making its suitability determination, the Board must "take into account all pertinent

14 information and input about the particular case from the inmate's victims, the officials

15 familiar with his or her criminal background, and other members of the public who have an

16 interest in the grant or denial of parole to this prisoner."  *In re Dannenberg,* 34 Cal.4th 1061,

17 1086 (2005).  California law affords a deceased victim's next of kin or immediate family

18 members the opportunity to make a statement at the prisoner's parole hearing.  *See* 15 CCR

19 § 2029.  In addition, a prosecutor may attend a parole hearing to represent "the interests of the

20 people," and may "comment on the facts of the case and present an opinion about the

21 appropriate disposition."  *See* Cal. Penal Code § 3041.7; 15 CCR § 2030.  *See also*

22 *Rosenkrantz v. Marshall,* 444 F. Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (noting that in the

absence of other reliable evidence of unsuitability in the record, opposition by law

REPORT AND RECOMMENDATION -17

01 enforcement based upon the nature of the commitment offense does not constitute "some

02 evidence" to support parole denial).  Because the Board relied upon other reliable evidence of

03 petitioner's unsuitability for parole, in addition to its consideration of opposition by law

04 enforcement and the victim's surviving spouse, its finding that petitioner would present an

05 unreasonable risk of danger to society if released on parole was not arbitrary and capricious.

06        4.        *Petitioner was Afforded Due Process of Law*

07        Contrary to petitioner's argument that the Board failed to consider or give appropriate

08 weight to the parole suitability rules which favored petitioner, the Board noted that petitioner

09 appears to have realistic parole and employment plans in Solano County, as well as the

10 marketable skill of vocational janitorial maintenance.  (*See* Dkt. 8, Ex. 2 at 102.)  In addition,

11 the Board commended petitioner for remaining discipline free since 1999, and completing

12 substantial self-help programming in prison, such as Alcoholics Anonymous and other

13 substance abuse education classes, Buddhist meditation study, the lifers' group, creative

14 writing and play writing, the prison arts project, Breaking Barriers, Framework for Recovery,

15 anger management courses, and earning laudatory chronos for his work in several vocations.

16 (*See id*. at 103-04.)  It is therefore an inaccurate characterization of the record to say that the

17 Board failed to provide petitioner with an individualized consideration of all relevant factors,

18 and only relied upon immutable facts such as the commitment offense to find him unsuitable

19 for parole.  (*See* Dkt. 1 at 4-6.)

20        As mentioned above, however, the Board has broad discretion to determine how

21 suitability and unsuitability factors interrelate to support its conclusion of current

22 dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.  Despite petitioner's recent

gains, the Board found that "these positive aspects of [petitioner's] behavior do not outweigh

REPORT AND RECOMMENDATION -18

01   the factors of unsuitability." (Dkt. 8, Ex. 2 at 104.)  The Board issued a one-year denial,

02   which reflected the "significant progress" made by petitioner since his previous hearing, at

03   which he received a three-year denial.  (*See id*. at 98.)  Although "[petitioner has] done

04   amazingly well, amazingly well," the Board ultimately determined that it needed "to see at

05   least some more time in evidence that [he is] going to continue on this path…." (*Id*. at 104-

06   05.)  It also asserted that petitioner should seek additional "therapy in order to face, discuss,

07   understand, and cope with stress in a nondestructive manner.  Until progress is made,

08   [petitioner] continues to be unpredictable and a threat to others." (*Id*. at 103.)  In light of

09   petitioner's lengthy history of severe mental illness related to the offense, the Board could

10   reasonably conclude that "a longer period of observation and evaluation is required before the

11   Board should find that [petitioner is] suitable for parole." (*Id*. at 98.)  The Board's parole

12   decision was therefore supported by "some evidence" in the record.

13           This court is aware that in 2007, approximately two years after the denial challenged

14   in this case, the Board denied a subsequent application by petitioner for parole.  Petitioner

15   filed a separate federal habeas petition on April 24, 2009, challenging that 2007 denial.  *See*

16   *Freeman v. Sisto*, case no. 2:09-cv-01180-KJM.  This court has not reviewed, however, the

17   evidence presented to the Board at the 2007 hearing, as the issue in this case is whether there

18   was "some evidence" in the record before the 2005 Board to support its decision.  Certainly,

19   the degree to which petitioner has been successful in dealing with his mental illness, and his

20   positive or negative institutional behavior during the interim between parole hearings, would

21   be highly relevant to the decision of the Board in 2007 decision.  Indeed, by deferring any

22   further parole consideration for a year, the 2005 Board was affording petitioner the

opportunity to demonstrate his sustained progress in all of these respects.  But evidence as to

REPORT AND RECOMMENDATION -19

01   whether he was successful in doing so during the interim period was not and could not have

02   been considered by the 2005 Board, so is not properly considered by this court in reviewing

03   the 2005 denial.

04        C.      *Petitioner's Equal Protection Claim*

05        Petitioner contends that his right to equal protection under the law was violated by the

06   Board, because "proportionality must be considered as part of the suitability determination in

07   order to determine what length of term does fit the crime." (Dkt. 1 at 7-10.)  Specifically, he

08   claims that "[t]he Board is required to find [an] inmate suitable and set a release date … with

09   the exception being a very limited class of cases where the crime is so egregious in

10   comparison to other similar offenses that a parole date cannot be fixed … [at the] initial

11   parole consideration hearing." (*Id*. at 8.)  Petitioner also argues that his period of

12   incarceration has exceeded the "Matrix Category for his offense…." (*See id*. at 5.)

13        The petition offers little support for petitioner's equal protection claim, and respondent

14   fails to address this issue on the merits. (*See id*. and Dkt. 8).  Contrary to petitioner's

15   assertions, California law does not require the Board to conduct a comparative analysis of the

16   period of confinement served by other prisoners with similar crimes, nor does it require the

17   Board to refer to the sentencing matrices.  *See In re Dannenberg*, 34 Cal.4th 1061, 1083-84

18   (2005) (holding whether an inmate poses a current danger is not dependent upon whether his

19   commitment offense was more or less egregious than other, similar crimes).  Instead, the

20   Board is required to review the specific facts of each case and to make an individualized

21   determination of whether that prisoner is suitable for parole.  *See Lawrence*, 44 Cal.4th at

22   1221.  Petitioner's allegations, without more, fail to establish an equal protection violation.

     The Court therefore finds that petitioner's equal protection claim lacks merit.

REPORT AND RECOMMENDATION -20

01        D.      *Petitioner's "No Parole Policy" Claim*

02        Finally, petitioner contends that "the Board has ignored the [governing] statute[s],

03   adopting its own policy of denying parole to virtually all term-to-life inmates." (Dkt. 1 at 5.)

04   In addition, he argues that "the Executive Branch has also implemented an illegal policy

05   under which it fails to follow the mandate of Penal Code § 3041 that parole dates 'shall

06   normally' be set, resulting in routine summary denials of parole without meaningful review of

07   the facts." (*Id*. at 5-6.)

08        As discussed above, petitioner's case received individualized consideration by the

09   Board during his 2005 parole hearing.  Furthermore, petitioner failed to provide any facts to

10   support his claim that the Board or Governor of California has instituted a "no-parole policy"

11   for prisoners with indeterminate life sentences.  (*See id*. at 6-7.)  Conclusory allegations,

12   without more, cannot provide a basis for habeas relief.  *See Jones v. Gomez,* 66 F.3d 199, 204-

13   05 (9th Cir. 1995) (stating that conclusory allegations are not sufficient to support habeas

14   relief).  Accordingly, petitioner's claim is unavailing.

15        E.      *Santa Clara County Superior Court Decision*

16        In a reasoned decision denying petitioner's request for habeas relief, the Santa Clara

17   County Superior Court concluded that the Board's 2005 "parole denial, for one year, can

18   withstand constitutional scrutiny." (*See* Dkt. 8, Ex. 3 at 1.)  As discussed above, the superior

19   court found that although the Board was precluded from finding that petitioner's motive for

20   the offense was inexplicable or trivial because it was rooted in petitioner's mental illness,

21   there was "some evidence" to support the Board's unsuitability determination because

22   petitioner has a "lengthy history of severe mental problems related to the offense." (*See id*.)

01        VII.    CONCLUSION

02        As stated above, it is beyond the authority of a federal habeas court to determine

03   whether evidence of suitability outweighs the circumstances of the commitment offense,

04   together with any other reliable evidence of unsuitability for parole.  The Board has broad

05   discretion to determine how suitability and unsuitability factors interrelate to support its

06   conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

07   Although the Board praised petitioner's recent progress in prison, it determined that petitioner

08   remains unpredictable, and therefore an unreasonable risk of danger to society if released.

09   Because the state court decision upholding the Board's findings satisfies the "some evidence"

10   standard, there is no need to reach respondent's argument that another standard applies.

11        Given the totality of the Board's findings, there is "some evidence" that as of

12   November 2, 2005, the date of the parole decision challenged in this case, petitioner's release

13   on parole would have posed an unreasonable risk of danger to society or threat to public

14   safety if released from prison.  The Santa Clara County Superior Court's Order upholding the

15   Board's decision was not contrary to, or an unreasonable application of, clearly established

16   federal law, or based on an unreasonable determination of facts.  I therefore recommend that

17   the Court find that petitioner's due process rights were not violated, and that it deny his

18   petition and dismiss this action with prejudice.

19        This Report and Recommendation is submitted to the United States District Judge

20   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

21   after being served with this Report and Recommendation, any party may file written

22   objections with this Court and serve a copy on all parties.  Such a document should be

captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

REPORT AND RECOMMENDATION -22

01 | objections within the specified time may waive the right to appeal the District Court's Order.

02 | *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

03 | Report and Recommendation.

04 |         DATED this 15th day of September, 2009.

05 |

06 |

07 |                                        JOHN L. WEINBERG
                                          United States Magistrate Judge

08 |

09 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

REPORT AND RECOMMENDATION -23